**RECORD NO. 15-4608**

*In The*

# United States Court Of Appeals
# For The Fourth Circuit

# UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

# v.

# DENNIS FERRETTI,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

_____

**BRIEF OF APPELLANT**

_____

**Elgine McArdle
MCARDLE LAW OFFICES
2139 Market Street
Wheeling, WV  26003
(304) 232-0700**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 ♦ Richmond, VA  23218
804-249-7770 ♦ www.gibsonmoore.net

# <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF ISSUE PRESENTED FOR REVIEW ........................ 1

STATEMENT OF THE CASE ............................................................. 1

    Statement of the Facts .............................................................. 2

SUMMARY OF ARGUMENTS ........................................................... 4

ARGUMENT ..................................................................................... 5

    STANDARDS OF REVIEW ............................................................ 5

    I.     U.S.S.G. § 2D1.1(b)(1) Applicable Law ................................. 5

    II     Analysis of Pertinent Facts Pre-Sentence .......................... 11

        A.     The transcript of the government's controlled buy proves beyond a reasonable doubt that the SKS and Highpoint Pistol actually belong to Privetera and as such cannot be used to enhance Dennis Ferretti's sentence ............................. 12

        B.     Tiffany Acree's Statement along with all other evidence in this case demonstrates that Ferretti was in possession of his Glock between October, 2014 and January, 2015 while at Privetera's house ~ no more, no less .......................... 14

i

C.    Privetera's Grand Jury testimony is self-serving and without question fails to prove anything...................................17

III.    Analysis of Pertinent Facts produced at sentencing...........................19

CONCLUSION .......................................................................................24

ORAL ARGUMENT ...............................................................................25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

## CASES:

*United States v. Cantero*,
    995 F.2d 1407 (7th Cir. 1993) ........................................................6

*United States v. Clark*,
    415 F.3d 1234 (10th Cir. 2005) .....................................................9

*United States v. Corcimiglia*,
    967 F.2d 724 (1st Cir. 1992).........................................................8

*United States v. Corral*,
    324 F.3d 866 (7th Cir. 2003) ........................................................7

*United States v. Drozdowski*,
    313 F.3d 819 (3d Cir. 2002) ......................................................6, 7

*United States v. Hall*,
    46 F.3d 62 (11th Cir. 1995) ..........................................................6

*United States v. Harris*,
    128 F.3d 850 (4th Cir. 1997) ...........................................4, 6, 7, 9

*United States v. Johnson*,
    943 F.2d 383 (4th Cir. 1991) ....................................................6, 8

*United States v. Lipford*,
    203 F.3d 259 (4th Cir. 2000) ........................................................7

*United States v. Lomax*,
    293 F.3d 701 (4th Cir. 2002) ........................................................7

*United States v. Manigan*,
    592 F.3d 621 (4th Cir. 2010) .............................................5, 8, 23

*United States v. McAllister*,
    272 F.3d 228 (4th Cir. 2001) ....................................................6, 8

iii

*United States v. Miggins*,
   302 F.3d 384 (6th Cir. 2002) ...........................................................6

*United States v. Nelson,*
   6 F.3d 1049 (4th Cir. 1993) ............................................................9

*United States v. Partida*,
   385 F.3d 546 (5th Cir. 2004) ..........................................................9

*United States v. Rusher*,
   966 F.2d 868 (4th Cir. 1992) ..........................................................9

*United States v. Thongsophaporn*,
   503 F.3d 51 (1st Cir. 2007)..............................................................9

*United States v. Ward*,
   171 F.3d 188 (4th Cir. 1999) ..........................................................6

*United States v. Willie*,
   462 F.3d 892 (8th Cir. 2006) ..........................................................9

## STATUTE:

18 U.S.C. § 3742(a) ...........................................................................1

## SENTENCING GUIDELINES:

U.S.S.G. § 2D1.1............................................................................2, 5, 9

U.S.S.G. § 2D1.1(b)(1) ..............................................................*passim*

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to Title18, U.S. Code § 3742(a). The United States District Court for the Northern District of West Virginia entered a judgment in this case on September 30, 2015, and having timely filed a Notice of Appeal on October 7, 2015, this appeal comes before the Court for consideration.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

### I.

Whether the district court erred in enhancing Defendant Ferretti's offense level under USSG § 2D1.1(b)(1).

## STATEMENT OF THE CASE

On April 7, 2015, a Federal Grand Jury for the Northern District of West Virginia returned a sixteen count indictment in which Appellant, Dennis Ferretti (hereinafter "Mr. Ferretti") was named in two counts. Count One charged a conspiracy to possess with intent to distribute and to distribute oxycodone beginning on or about January 1, 2014 and continuing through the date of the Indictment on April 7, 2015.  Count Three charged Mr. Ferretti with possession with the intent to distribute oxycodone at or near Marshall and Wetzel Counties, West Virginia (Joint Appendix, [hereinafter "JA"] Vol. I at 9-28).

1

On June 24, 2015, Mr. Ferretti entered a guilty plea to Count One of the Indictment (JA Vol. I at 29-33), reserving the right to litigate the applicability of the gun enhancement pursuant to USSG § 2D1.1.

A presentence investigation report with addendum of objections was disclosed on August 3, 2015 (JA Vol. II, 96-114). A second addendum of Objections to the Presentence Investigation Report, with Attachment of Defendant's Objections was filed on August 28, 2015 (JA Vol. II, 115-122).

The Government filed its Sentencing Memorandum on September 25, 2015, (JA Vol. II, 123-133) to which Defendant filed his response on September 28, 2015 (JA 134-144).

On September 30, 2015, the district court sentenced Mr. Ferretti to a 46 month term of incarceration. (JA Vol. I at 88). Mr. Ferretti timely filed a Notice of Appeal on October 7, 2015. (JA Vol. I at 94). Mr. Ferretti files this appeal seeking a remand for a sentence which does not include the gun enhancement under § 2D1.1 and also gives him the benefit of the safety valve reduction.

### Statement of the Facts

Dennis Ferretti is a 37 year old drug addict with no prior criminal history who, by virtue of his addiction became involved in a conspiracy to distribute oxycodone for the sole purpose of supporting his habit. Unlike his co-conspirator Christopher Privetera who was a felon in illegal possession of many firearms during the

2

conspiracy, Dennis Ferretti legitimately possesses a concealed carry permit, and possessed only ***ONE firearm, a legally purchased Glock pistol***. The facts as presented in discovery make it clearly improbable that Dennis Ferretti possessed the Glock in connection with the drug distribution conspiracy; furthermore, the discovery and testimony at sentencing makes it abundantly clear that the SKS rifle and the High-point pistol did not belong to Ferretti but rather to Privetera inasmuch as Privetera claims ownership of those two guns in the recorded control buy of March 3, 2015.

The District Court imposed a forty-six (46) month period of incarceration under the Federal Sentencing Guidelines due to a gun enhancement which is not factually supported by the record. Despite the government's valiant effort to interpret its own facts to defendant's detriment, the government's own exculpatory discovery and Jencks statements disprove that an application of the gun enhancement is warranted.[1] Furthermore, the testimony at sentencing was consistent with both the discovery and Jencks statements.

As more fully detailed within the argument, the allure of truth is that it surfaces at all costs. The evidence establishes that Ferretti and the Glock were at Privetera's house at the same time between October, 2014 and January, 2015. (JA Vol. II, 123-

---

[1] See Defendant's Response to Government's Sentencing Memorandum JA Vol. II 134-144

3

125) Further evidence demonstrates that Ferretti had no guns in his possession when he was stopped and arrested for possession with intent to distribute in Moundsville, WV on April 8, 2014 (JA Vol. II, 69); and no evidence exists to demonstrate Ferretti used his Glock for protection in the conspiracy at any time. All the evidence is inconsistent with the government's premise and theory of culpability.

The truth is Ferretti never used his Glock for protection and he had no need for any of Privetera's guns. When given the opportunity to legitimately "carry" his firearm for protection in connection with drug distribution, he didn't do so. Mr. Ferretti was nothing more than a drug addict doing what he could to get his next high, including stealing $15,000 cash and more drugs from Privetera.

## SUMMARY OF ARGUMENTS

### I.

The district court committed reversible error in applying a two level enhancement for possession of a firearm in connection with Mr. Ferretti's drug conspiracy conviction. The discovery, Jencks Statements, as well as testimony elicited at sentencing demonstrated that the connection between Mr. Ferretti's legally possessed Glock and his narcotics offense was "clearly improbable" under the 4th Circuit law of *U.S. v. Harris*, 128 F.3d 850, 853 (4th Cir. 1997)

## ARGUMENT

## <u>STANDARDS OF REVIEW</u>

### I.

The determination of whether to apply a two level enhancement under USSG § 2D1.1(b)(1) is clearly a factual issue and thus reviewable for clear error. *United States v. Manigan*, 592 F.3d 621, 630-31 (4th Cir. 2010)

### I.  U.S.S.G. § 2D1.1(b)(1) Applicable Law

The lone issue for consideration is Mr. Ferretti's claim that the district court erred in enhancing his offense level under USSG § 2D1.1(b)(1), which must be reviewed for clear error.  *United States v. Manigan*, 592 F.3d 621, 630-31 (4th Cir. 2010).

United States Sentencing Guidelines, Section 2D1.1(b)(1) states:

**§2D1.1.   <u>Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy</u>**
(b)     Specific Offense Characteristics
(1)     If a dangerous weapon (including a firearm) was possessed, increase by **2** levels.

The relevant Application Notes provide that the weapon enhancement "should be applied if the weapon was present unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.3.

As Judge Wilkins explained, the Government must prove by a preponderance of the evidence that "the weapon was possessed in connection with drug activity that

5

was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister*, 272 F.3d 228, 233–34 (4th Cir. 2001) (internal quotation marks omitted). To satisfy that burden, however, the Government does not need to prove "precisely concurrent acts," such as a "gun in hand while in the act of storing drugs." *United States v. Johnson*, 943 F.2d 383, 386 (4th Cir. 1991). Rather, proof of constructive possession of the dangerous weapon is sufficient, and the Government is entitled to rely on circumstantial evidence to carry its burden. *See United States v. Miggins*, 302 F.3d 384, 391 (6th Cir. 2002); *United States v. Hall*, 46 F.3d 62, 64 (11th Cir. 1995). In assessing whether a defendant possessed a firearm in connection with relevant drug activity, a sentencing court is entitled to consider several pertinent factors. One important factor is the type of firearm involved. See *United States v. Drozdowski*, 313 F.3d 819, 822 (3d Cir. 2002) (identifying type of firearm as relevant to application of weapon enhancement).

As Judge Wilkinson explained in *United States v. Harris*, 128 F.3d 850, 853 (4th Cir. 1997), and as the Guidelines emphasize, see USSG § 2D1.1(b)(1) cmt. n.3, an unloaded hunting rifle is a firearm that would not be readily connected to drug activities. A handgun, on the other hand, has been deemed "a tool of the drug trade because it is easy to conceal yet deadly." *United States v. Cantero*, 995 F.2d 1407, 1411 (7th Cir. 1993) (internal quotation marks and alteration omitted); see also *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) (observing that handguns

6

are "indicia of drug dealing"). More specifically, a drug trafficker is much more likely to utilize a handgun — as opposed to a rifle or long gun — due to size and concealability. See *United States v. Lipford*, 203 F.3d 259, 267 n.7 (4th Cir. 2000) ("When a gun is involved in criminal activity, it is far more likely to be a handgun than a rifle."). The location or proximity of a seized firearm is also relevant to a sentencing court's analysis of whether it was possessed in connection with drug activities that were part of the same course of conduct or common scheme as the offense of conviction. Indeed, "the proximity of guns to illicit narcotics can support a district court's enhancement of a defendant's sentence under section 2D1.1(b)(1)." *Harris*, 128 F.3d at 852. Similarly, firearms that are readily accessible during drug activities can be deemed as possessed in connection therewith. See *United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003) ("[G]uns found in close proximity to drug activity are presumptively connected to that activity."); *Drozdowski*, 313 F.3d at 823 (discussing accessibility as relevant factor). If a drug offender has stored a handgun that can readily be accessed if his drug activities turn sour, he may be said to have possessed it in connection with such activities. Cf. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing that readily accessible firearm suggests close nexus between drug activities and firearm possession). In short, as one of our sister circuits has explained, so long as a firearm's "location makes it readily available to protect either the participants themselves during the commission of the illegal

7

activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapon[ ] to the offense conduct." *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992).   Importantly, a sentencing court faced with whether to apply the weapon enhancement is entitled to take reasonable account of the settled connection between firearms and drug activities.

Notwithstanding the predominant caselaw regarding the U.S.S.G §2D1.1(b)(1) enhancement, Judge Michael's partial dissent in *Manigan, supra,* is instructive in the analysis before the Court in Mr. Feretti's case.  As eloquently stated by Judge Michael,

> **"[the] frequency of use makes it imperative that the boundaries for application of the enhancement remain clear and meaningful**. Here, the majority's error is compounded by the fact that it blurs a previously clear boundary, leaving district courts to wonder whether any real limitation remains. **To maintain clarity, we should hold to the purpose and scope of the enhancement as recognized until today**.
> …
> The application note confirms what is obvious from common sense, but perhaps not from a literal reading of § 2D1.1(b)(1): **mere possession is not enough for application of the enhancement.** The majority notes this limitation, citing *United States v. McAllister*'s rule that the government must prove that "the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." 272 F.3d 228, 233-34 (4th Cir. 2001) (emphasis added). Thus, **for the enhancement to apply, the government must prove not only that the defendant possessed the weapon, but also that the weapon had a role in the offense of conviction.** In the case of a gun, it need not have been discharged, brandished, or even kept on the defendant's person during the offense, see United States v. Johnson, 943 F.2d 383, 386 (4th Cir. 1991), but **it must have served the defendant's purpose in carrying out the drug crime for which he was convicted. It is sufficient, for**

**example, that the weapon was "readily available to protect" the
defendant or his drugs, even if the defendant never specifically
intended to use it.** *United States v. Thongsophaporn*, 503 F.3d 51, 58
(1st Cir. 2007). Unless the defendant's words or actions explained the
weapon's role, proving that the **§ 2D1.1(b)(1) enhancement applies
will require evidence that the weapon had a temporal and spatial
nexus to the offense**. *United States v. Willie*, 462 F.3d 892, 899 (8th
Cir. 2006); *United States v. Clark*, 415 F.3d 1234, 1241 (10th Cir.
2005); *United States v. Partida*, 385 F.3d 546, 562 (5th Cir. 2004).
**When the defendant's possession of the weapon is not established
until long after the offense, the temporal nexus is not satisfied**. See
*Clark*, 415 F.3d at 1242 (rejecting application of enhancement when
defendant was found in possession of gun 15 months after offense of
conviction). Similarly, **when the weapon is not in close proximity to
the drugs or a drug-related transaction, the spatial nexus is not
satisfied**. See *United States v. Harris*, 128 F.3d 850, 852 (4th Cir.
1997). In *United States v. Rusher* we held that the § 2D1.1(b)(1)
enhancement applied when "one of the firearms was located in the same
briefcase that contained the drugs, and the others, fully loaded, were
found in the bed of the same truck." 966 F.2d 868, 880 (4th Cir. 1992).
In *United States v. Nelson* we held that the enhancement applied when
guns were found with defendants in "a place of manufacturing, storing
and distributing [of] crack cocaine." 6 F.3d 1049, 1056 (4th Cir. 1993).
Of course, **even if a temporal and spatial nexus exists, other
evidence might establish that it was clearly improbable that the gun
had a role in the offense**. For example, even if an unloaded hunting
rifle was in a nearby closet in the defendant's residence during a drug
transaction, the enhancement might not apply. § 2D1.1 cmt. n.3 (2007).

In this case, the record is void of any specific finding as to the connection

between Ferretti's gun and the drug offenses. The government failed to establish the

correct facts to which the law must be applied; *__facts which the government assumed__*

*__prior to a thorough investigation__*. From the onset of plea negotiations, the

government sought to include a stipulation to a gun enhancement. From the onset

of the plea negotiations, Defendant contested the proof regarding the gun

9

enhancement because the discovery contained absolutely no evidence to support a gun enhancement.  The timing of the evidence to support the "gun enhancement" is important to note.  It's almost as though the enhancement was an afterthought used to increase Mr. Ferretti's sentence for without the enhancement, Mr. Ferretti's 47 month sentence would have been reduced to 30 months under the applicable guidelines.  Consider the following:

1) The first plea offer made on May 21, 2015 included a proposed stipulation to the gun enhancement which Defendant contested.
2) Privetera's very weak testimony regarding Ferretti's alleged "use of guns in connection with the conspiracy" did not occur before the Grand Jury until June 2, 1015. (JA Vol. II 129-144)
3) The DEA debriefed Mr. Ferretti on August 13, 2015.
4) Ms. Tiffany Acree was interviewed the day after on August 14, 2015. (JA Vol. II 123-125)

Based upon the facts learned during the post plea and pre–sentence phases, no evidence supports the proposed enhancement.

With no facts to support the enhancement, not only should the gun enhancement fail, Defendant is entitled to the safety valve provision of the guidelines.  The net result of his sentence should be a base offense level of 24, minus 3 levels for acceptance of responsibility, minus 2 levels under the safety valve provision for a total offense level of 19.  With a criminal history category I, Defendant's sentence is appropriately calculated at 30-37 months.

## II.  Analysis of Pertinent Facts Pre-Sentence

In its independent findings of the facts in this matter, the Probation Officer attributes possession of an SKS and a Highpoint Pistol to Dennis Ferretti "while he lived with Christopher Privetera."   However, contrary to this assertion, Privetera claims ownership of the two guns.  Furthermore, no facts within the discovery or the entire presentence report establish the actual time period that Mr. Ferretti "lived with" Christopher Privetera, and no other statement exists to tie use of the SKS and High Point to Ferretti.   Rather the government's evidence proves that between January 1, 2014 and April 7, 2015, Mr. Ferretti did not continuously live with Christopher Privetera and conclusively that Mr. Ferretti's legally purchased and possessed ***Glock was not at Privetera's house for the majority of the conspiracy.***

Of particular import are the following government disclosures:

A.  Transcript of the Controlled Buy, March 3, 2015, Video 2 and 3 (Discovery p. 437)

B.  Tiffany Acree Statement August 14, 2015 (JA Vol. II, 123-125)

C.  Grand Jury Testimony of Chris Privetera. (JA Vol. II, 129-144)

**A.**     <u>**The transcript of the government's controlled buy proves beyond a reasonable doubt that the SKS and Highpoint Pistol actually belong to Privetera and as such cannot be used to enhance Dennis Ferretti's sentence**</u>

<u>**Probation Officer Findings p. 7, paragraph 31**</u>

> "In addition, Christopher Privetera provided Grand Jury testimony that while defendant was living with him, the defendant possessed the Glock pistol, <u>***an SKS rifle, and a High-point pistol.***</u>

<u>**Christopher Privetera's Grand Jury Testimony states the following in reference to the SKS and the High Point pistol:**</u>

```
1        A    Oh, yes.

2        Q    -- he had a firearm at your house?

3        A    Oh, yes.  A couple.

4        Q    What kind of a fire -- firearm did he have?

5        A    There was a -- I believe the one that was in the case was

6   a Glock.  There was an SKS rifle.

7        Q    That was his?

8        A    Yeah.  And there also was a Hi-Point .45 cal.  The one that

9   was mine was the Smith & Wesson out of the four that were there.

10       Q    Where did he keep the Glock?

11       A    He changed it all around.  I mean, he'd keep it in the

12  basement.  He'd keep it up over the cabinet in the kitchen.  He'd take it

13  out to the garage.  It was all over the place.

14       Q    Did he ever have it in the room -- the bedroom he was staying

15  in?

16       A    Yeah.  Yeah.  He had it in the closet sometimes, yeah.

17       Q    Did he ever have oxycodone tablets in his room?

18       A    Oh, I'm sure.

19       Q    In the same room as the Glock?

20       A    Oh, I'm sure, yeah.
```

Dennis Ferretti never owed an SKS rifle nor a High Point pistol. This finding is unequivocally proven wrong by a video recording of Christopher Privetera at time when he had no reason to fabricate an untruth. That is, in the course of a controlled buy, Christopher Privetera claimed ownership of the SKS and the HighPoint when he stated the following: (discovery p. 437)

"05:00 What's the ammo for? --- I have an SKS"

"06:36 This is your Glock --- It's Dennis's, It's mine now."

"07:00 That one's mine, Hi-Point, 9mm"

"09:30 You keeping it? --- I'm going to sell it - $300

"11:27 I'll think about it – Let me know."

Of course, this conversation took place when Ferretti was no longer part of the conspiracy as he had stolen $15,000 from Privetera and fled to Florida (Government's Version of the Offense, PSR, p. 4, paragraph 20). Furthermore, Privetera was clearly hunting Ferretti down on March 3, 2015, as clearly stated by him in the controlled video 2 when he stated: (Discovery p. 436)

"05:42 Ferretti stealing 15Gs and 200 beans, If I see him; I'll end his life."

Based upon these 180 degree opposite statements, one which was made when Privetera did not know he was being recorded, and the other made after he had made a deal with the government and wanted to minimize his exposure, is it improbable that Ferretti was using his Glock for protection in the distribution of drugs?

13

Absolutely.  Ferretti stole $15,000 and pills from Privetera and fled for Florida.  If there was ever a time that he needed protection, it was after February, 2015 when he had stolen drugs and money from Privetera and fled to Florida.  Contrary to protection in connection with drug distribution as the government would interpret the evidence, Ferretti left his Glock at Privetera's home.  The SKS and the Highpoint belong to Privetera, not Ferretti.  Furthermore, no evidence exists to warrant "joint possession" of guns within the conspiracy because co-Defendant Katie Ingold, who was present during the March 3, 2015 controlled buy, did not receive a gun enhancement despite her physical presence and actual knowledge of Privetera's use of guns in connection with his sale of drugs.

**B.**    **Tiffany Acree's Statement along with all other evidence in this case demonstrates that Ferretti was in possession of his Glock between October, 2014 and January, 2015 while at Privetera's house ~ no more, no less.**

**Probation Officer Findings p. 7, paragraph 31**

> "In addition, Christopher Previtera provided Grand Jury testimony that *__while defendant was living with him__*, the defendant possessed the Glock pistol, an SKS rifle, and a High-point pistol."

Crucial to a finding that Dennis Ferretti possessed the Glock *__while living with Privetera__* is the establishment of the time period Dennis Ferretti actually lived with Privetera in his home between January 1, 2014 and April 7, 2015.  As previously stated, the government's own Jencks statements, produced after the plea and disclosure of the presentence report, demonstrate that the period of time that Ferretti

14

actually lived with Privetera and had the Glock in his possession is minimal at best. That time period begins on October 1, 2015[2] and ends sometime in January/February, 2015.[3] Further, no evidence exists during that limited time period that Ferretti did use his Glock for protection or in connection with any drug sales. Just as the government wants the Court to use circumstantial inferences from the evidence to prove by a preponderance that Ferretti had the Glock at Privetera's house "while Defendant was living with him," so too can circumstantial inferences be drawn from the actual evidence before the court. Assuming Ferretti lived with Privetera the entire period of the conspiracy, (Privetera GJ Transcript p. 13, Lines 17-19) the government's search warrant executed in September, 2014 should have produced Ferretti's Glock if, in fact, Ferretti was living with Privetera and stored his Glock "all over the place … in the basement, in the garage, in the kitchen cabinet, and in his room." (Privetera GJ Transcript p. 14, Lines 10-20) ~ ***NOT SO***. The evidence discloses the following:

1) Ferretti lived with Privetera from sometime in November, 2013 until June, 2015[4]
2) Ferretti was stopped with Oxycodone on April 8, 2014, search of his vehicle produced no Glock.[5]
3) Ferretti moved in with Tiffany Acree in the summer of 2014 and lived with her until Fall, 2014 when she kicked him out because he was drug addict[6]

---

[2] Tiffany Acree Statement
[3] Privetera Grand Jury Testimony
[4] Privetera (Grand Jury Testimony p. 13, Lines 17-19) and Tiffany Acree Statement
[5] Count 3 Indictment
[6] Tiffany Acree Statement

4)  Ferretti had the Glock at Tiffany's home between June, 2014 and Fall, 2014[7]
5)  State search warrant executed in September, 2014 – no Glock seized[8]
6)  Tiffany sent Glock to Ferretti about a month after kicking him out.[9]
7)  Ferretti steals $15,000 and leaves for FL and leaves Glock[10]
8)  March 3, 2015 Controlled Buy of Glock – Privetera claims ownership of gun[11]

### CONSPIRACY TIMELINE

1.1.14================================================= 4.7.15

| 1.1.14 to 6.14 | 6.14 to 8.14 | 8.14 to 2.15 | 2.15 to 4.15 |
|---|---|---|---|
| Ferretti w/Privetera (6 months) | Ferretti w/Acree | Ferretti w/Privetera (6 months) | Ferretti leaves WV |

4.8.15 Ferretti stopped on Route 2, arrested for possession with intent to distribute oxycodone, ***NO GUNS, NO GLOCK*** (Indictment, Count 3)

6.14 to 9.14 Glock at Acree's House (Acree 8.14.15 statement)
***Kept Glock at her house because scared of Ferretti suicide***

9.14 Search Warrant executed
***No Glock*** (Govt Version PSR, p.4, paragraph 19)

10.14 Acree sends Glock to Privetera's house

2.15 Ferretti Leaves for FL wo/Glock

3.15 Glock sold to CI

---

[7] *Id*
[8] Government Version PSR, p.4, paragraph 19
[9] Tiffany Acree Statement
[10] Privetera (Grand Jury Testimony p. 13, Lines 20-21)
[11] Government discovery p.437

16

The allure of truth is that it surfaces at all costs. The evidence establishes that Ferretti and the Glock were at Privetera's house at the same time between October, 2014 and January, 2015. Further evidence demonstrates that Ferretti had no guns in his possession when he was stopped and arrested for possession with intent to distribute in Moundsville, WV on April 8, 2014; and no evidence exists to demonstrate Ferretti used his Glock for protection in the conspiracy at any time. All the evidence is inconsistent with the government's premise and theory of culpability.

The truth is Ferretti never used his Glock for protection and he had no need for any of Privetera's guns. When given the opportunity to legitimately "carry" his firearm for protection in connection with drug distribution, he didn't do so. Mr. Ferretti was nothing more than a drug addict doing what he could to get his next high, including stealing $15,000 cash and more drugs from Privetera.

**C.    Privetera's Grand Jury testimony[12] is self-serving and without question fails to prove anything.**

When a true direct examination regarding Mr. Ferretti's sale of guns is posed to Privetera, absolutely no evidence is produced that would warrant probable cause to arrest Mr. Ferretti for the sale of firearms, much less firearms in exchange for drugs. In the PSR, the Government makes a bold conclusory statement without the benefit of any evidence to support the same.

---

[12] Privetera Grand Jury Transcript p.15

**<u>Government's Version PSR p.6, paragraph 25</u>** specifically states,

> "Mr. Ferretti sold a firearm to a friend of Mr. Privetera's main New Jersey supplier of Oxycodone."

The government's conclusion that this occurred based upon Mr. Privetera's grand jury testimony is tenuous at best. The government's assertion fails to meet a preponderance of evidence standard based upon Privetera's sworn testimony which states in relevant part:

```
 8          Q      Did Mr. Ferretti ever sell any firearms to anyone?

 9          A      He may have sold -- I think -- It was -- A couple were sold

10    to a couple guys that came from New Jersey that were with "Nice's" crew.

11    Dennis sold one, I believe, and another buddy of mine sold one, too.

12          Q      Who's the other buddy?

13          A      Mike White.

14          Q      And to whom were they sold?

15          A      They were actually sold to "Nice's" brother, which we -- I

16    didn't know his real name.  His name -- He just went by a nickname.  It

17    was "DU".

18          Q      "DU".  Is that --

19          A      And --

20          Q      -- the gun Mike White sold?

21          A      Yeah.  Mike White sold him that one.  And I believe the --

22    the one that Dennis sold was maybe to that Jimmy Bones, but I'm not positive

23    on that.

24          Q      Bones?
```

```
1          A     Yeah.   Jimmy Bones.

2          Q     Is that the group Sticks and Bones?

3          A     I guess.

4          Q     A very famous rap group.

5          A     Uh-huh.
```

Not only is this testimony vague, it fails to even set forth a time frame within which Mr. Ferretti allegedly sold firearms.  The question posed was, "Did Mr. Ferretti ever sell any firearms to anyone?"  This testimony would be insufficient to obtain an Indictment based upon probable cause.  It fails to inform the Defendant of when the alleged firearms were sold, what firearms were sold, to whom they were sold, for what price, where it was sold, to name a few minor details.  The sale of firearms in and of themselves is not illegal.  This testimony fails, under any scenario, to prove the requisite facts to establish an enhancement for firearms under the Federal Sentencing Guidelines.  The sentencing testimony proves that it never happened.

### III.    Analysis of Pertinent Facts produced at sentencing

The evidence provided at sentencing disclosed the following:

1)    Ferretti lived with Privetera from sometime in November, 2013 (JA Vol. I p. 38-39) until February, 2015 (JA Vol. 1, p. 39) with the exception of between April, 2014 and August, 2014 (JA Vol. I, p. 65)

2)    Ferretti was stopped with Oxycodone on April 8, 2014, search of his vehicle produced no Glock. (JA Vol. I. p.69)

3)    Ferretti moved in with Tiffany Acree in the summer of 2014 and lived with her until Fall, 2014 when she kicked him out because he was drug addict (JA Vol. I, p. 65)

4)    Ferretti had the Glock at Tiffany's home while he lived there until Fall, 2014 (JA Vol. I, pp. 65-66)

5)    State search warrant executed in September, 2014 – no Glock seized[13]

6)    Tiffany sent Glock to Ferretti about a month after kicking him out.[14]

7)    Ferretti steals $15,000 and leaves for FL and leaves Glock[15]

8)    March 3, 2015 Controlled Buy of Glock – Privetera claims ownership of gun[16]

9)    Privetera's testimony establishes that drug distribution occurred at his home, but that Ferretti was not always there, and nowhere in his testimony does he state that the Glock was used for protection or in connection with any of the drug distributions. When he does talk about firearms, it is in connection with Privetera's possession of the guns.[17]

10)    When asked if Ferretti saw him with guns, Previtera's testimony establishes "I never really – I mean, I had them. I didn't use them all the time. I mean – I would say maybe one or two times he would have seen me in possession of them."[18]

---

[13] Government Version PSR (JA Vol. II, 101)

[14] Tiffany Acree Statement (JA Vol. II, 123-125)

[15] Privetera (JA Vol. II  136)

[16] Government discovery p.437)(JA Vol. II  137)

[17] JA Vol. II, 39-45

[18] *Id. 45*

11) When asked about Ferretti's possession of Ferretti's Glock, Previtera's testimony establishes "I believe it was a Glock nine millimeter that he carried in a case … he moved it all around the house… it was out in the garage.  It's hard to say." [19]

12) In the government's attempt to associate the Glock with drug distribution, the questioning proceeded as follows:

**In Ferretti's bedroom (JA Vol. I 46-47) – no distribution in the bedroom**

"So he had a designated bedroom where he was staying."
"Yes"
"Did her ever have oxycodone tablets in his bedroom?"
"I believe so."
"Did you ever observe it?"
"Yeah. Yeah, ***his own script, yeah***."

**In the kitchen (JA Vol. I 47) – no specific reference to Ferretti's gun and distribution at the same time**

"And you said in the kitchen."
"Yeah, that was where the gun was, up over top of the cabinets."
"Was there ever a time when you guys had oxycodone tablets in the kitchen?"
"Oh I'm sure."
"Were there customers that came into the kitchen?"
"If you came in the house, you came into the kitchen?"
"So you come into the house, you're a customer, you walked through the kitchen?"
"Correct."
"And that's one of the locations where Mr. Ferretti held a firearm?"
"When you say held?"
"Stored a firearm?"
"Correct, yes."

---

[19] *Id. 46*

**<u>Any other firearms (JA Vo. I 47-51) – disproves any other firearm including the alleged sale of the SKS and rifle as testified to in grand jury</u>**

"Did you ever see Mr. Ferretti in possession of any other firearms?"

"No, I don't believe so."

"So other than the Glock, he was in possession of no other firearms?"

"To the best of my knowledge."

"So the whole testimony about this sale in the kitchen about a gun in exchange for $200 to a supplier could not have happened if you never saw him in possession of any other gun besides the Glock, correct?"

"I can't say year or no to that, because like I said, I don't really – I was there. I wasn't involved in that purchase"

"And the only firearm you ever saw Mr. Ferretti in possession of was a Glock?"

"Yes"

"So Mr. Ferretti was never in possession of an SKS?"

"I don't believe so."

"And Mr. Ferretti was never in possession of a Hi-Point?"

"No, I don't think so."

Mr. Ferretti did not continuously live at Previtera's house. With no specific evidence regarding his presence with the Glock at Previtera's house, the location of the Glock and whether Previtera's drug deals were going on at the same time, as well as Acree and Previtera's testimony that the Glock was not even at Previtera's home for the greater portion of the conspiracy alleged in the Indictment, it is highly improbable that the Glock was connected to the drug distribution.

The above facts establish the improbability of a § 2D1.1(b)(1) connection but when combined with Mr. Ferretti's lack of criminal record, his distribution merely to support his habit, the fact that he did not have his Glock or any gun when arrested,

and the fact that he left his gun at Previtera's home after stealing $15,000 and drugs, the facts demonstrate the improbability that the gun had any role in the offense.

Applying the standard of clear error and recognizing that this Court must give great deference to the trial court's analysis, Mr. Ferretti would respectfully request that this Court inquire if the district court "wonder[ed] whether any real limitation remains" as stated by Judge Michael in his *Manigan, supra,* dissent.  That is, **"To maintain clarity, we should hold to the purpose and scope of the enhancement as recognized:"**

> …**mere possession is not enough for application of the enhancement.**
>
> …**for the enhancement to apply, the government must prove not only that the defendant possessed the weapon, but also that the weapon had a role in the offense of conviction.**
>
> … **it must have served the defendant's purpose in carrying out the drug crime for which he was convicted. It is sufficient, for example, that the weapon was "readily available to protect" the defendant or his drugs, even if the defendant never specifically intended to use it.**
>
> ... **the § 2D1.1(b)(1) enhancement applies will require evidence that the weapon had a temporal and spatial nexus to the offense**.
>
> ...**When the defendant's possession of the weapon is not established until long after the offense, the temporal nexus is not satisfied**.
>
> …**when the weapon is not in close proximity to the drugs or a drug-related transaction, the spatial nexus is not satisfied**.

**… even if a temporal and spatial nexus exists, other evidence might establish that it was clearly improbable that the gun had a role in the offense**

No evidence exists other than mere possession.  No evidence exists to prove that the Glock had a role in the offense of conviction.  No evidence supports that the Glock served a purpose in Mr. Feretti's drug conviction.  No evidence exists to demonstrate that the Glock was readily available to protect Mr. Ferretti or his drugs. No evidence exists to prove the Glock had a temporal or spatial nexus to the offense. No evidence exists to demonstrate the Glock was in close proximity to the drugs or a drug related transaction.   Other evidence exists to demonstrate that it was improbable that the Glock had a role in the offense ~ Mr. Ferretti had no priors, had a concealed carry permit, legally owned the Glock, did not carry the Glock on his person when he did have drugs, did not have the Glock with him for a period of time when he was living with Previtera, and most importantly, Mr. Ferretti left his Glock at Previtera's home after stealing $15,000 and drugs for his personal use.

## CONCLUSION

If ever there was a case to demonstrate that it is improbable that a weapon was used in connection with a drug offense, this is the case.  The government's case for enhancement was an afterthought, improperly applied, and warrants reversal for specific findings of the connection.  Fact of the matter is there is no connection and

24

Mr. Ferretti's sentence should be reversed and remanded to remove the §

2D1.1(b)(1) enhancement and apply the safety valve reduction.

## **ORAL ARGUMENT**

Mr. Ferretti would submit the case on the record and the briefs with no need

for oral argument.

Respectfully submitted,

DENNIS FERRETTI

by:    /s/ Elgine Heceta McArdle
Of Counsel

Elgine Heceta McArdle, Esq.
W.V. I.D. No. 6249
MCARDLE LAW OFFICE
2139 Market Street
Wheeling, WV  26003
(304) 232-0700

*Counsel for Appellant*

25

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>5,468</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

    <u>/s/ Elgine McArdle</u>
    Elgine McArdle

    *Counsel for Appellant*

Dated:  December 7, 2015

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on December 7, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users:

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Karen R. Taylor
Karen R. Taylor
GIBSON MOORE APPELLATE SERVICES, LLC
206 East Cary Street P.O. Box 1460 (23218)
Richmond, VA 23219
(804) 249-7770